# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MELANIE BRINER, et al., | ) | CASE NOS.  1:07CV129 |
| | ) | 1:09CV1121 |
| | ) | |
| | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINON |
| | ) | |
| | ) | |
| THE CITY OF ONTARIO, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

In Case No. 1:07CV129, the parties have filed numerous motions that are now at issue: (1) the motion of Defendants Thomas Hill and Dallas Strickler for summary judgment based on qualified immunity (Doc. No. 147); Plaintiffs' motion to strike Hill and Strickler's summary judgment motion (Doc. No. 153); Defendant Timothy McClaran's motion for summary judgment based on qualified immunity (Doc. No. 148); and Plaintiffs' motion to strike McClaran's summary judgment motion (Doc. No. 152). Also before the Court, in Case No. 1:09CV1121, is the motion of Defendants Rebecca Thomas and the City of Ontario for summary judgment based on qualified immunity and arguments on the merits (Doc. No. 17). All motions are fully briefed and are ripe for decision.

**Background**

The facts surrounding these two related cases have been set forth in numerous Memorandum Opinions of this Court, as well as the Sixth Circuit's March 26,

2010 decision, familiarity with is presumed. For purposes of the present motions, it is sufficient to note that these actions arise out of Plaintiffs' various interactions with employees of the city of Ontario, Ohio (hereinafter "the City"), including: Plaintiffs' complaints that local law enforcement officials had failed to investigate certain thefts associated with their business, F&W Towing; criminal charges filed against Melanine Briner in connection with one of the thefts; F&W Towing's removal from various local towing lists; Plaintiffs' efforts to put a proposal calling for a "Citizen's Police Review Board" on the local ballot; and Defendants' reactions to signs posted on the Briner's property in connection with the review proposal.[1]

On January 17, 2007, Plaintiffs, Melanie and Thomas Briner, filed an action in this Court against the City and certain City employees, raising claims under 42 U.S.C. § 1983 and state common law. (Case No. 1:07CV129, hereinafter "*Briner I*.") In their Amended Complaint, Plaintiffs allege that Defendants retaliated against them for exercising their First Amendment right to criticize the Ontario Police Department (hereinafter "OPD"); had prosecuted Melanie Briner without probable cause, in violation of the Fourth Amendment; and had deprived Plaintiffs of due process and equal protection. Plaintiffs also brought claims for federal conspiracy under § 1983, as well as various state law claims.

Plaintiffs filed a second lawsuit on May 14, 2009. (Case No.1:09CV1121, hereinafter "*Briner II*.") This action was initiated solely against the City's Law Director, Rebecca Thomas, and the City, itself, and was confined to Thomas's role in initiating

---

[1] Where necessary, the Court will supplement these facts in the body of its analysis.

criminal misdemeanor charges against Melanie Briner. The Complaint raises claims of malicious prosecution, First Amendment retaliation, and loss of consortium.

Defendants sought summary judgment in *Briner I*. In a decision dated April 16, 2008, the Court dismissed the majority of the federal claims, and declined supplemental jurisdiction over the state law claims. (Doc. No. 115.) On reconsideration, the Court dismissed the remaining claims, and issued a final, appealable order. (Doc. Nos. 134 and 135.)

On appeal, the Sixth Circuit affirmed this Court's grant of summary judgment on a portion of the retaliation claim, the malicious prosecution claim as to Defendant Strickler, and the First Amendment claim as to Defendants Hill and Snavely, only. It reversed this Court's dismissal of the remaining claims, finding genuine issues of material fact as to these claims, and remanded the matter to this Court for further proceedings. *Briner v. City of Ontario*, Case No. 08-3731, 2010 U.S. App. LEXIS 6271 (6th Cir. Mar. 26, 2010). In so ruling, the Sixth Circuit indicated that the issue of qualified immunity could be raised on remand.[2] *Id*. at 42, n.26.   On June 1, 2010, Defendants Hill, Strickler, and McClaran moved for summary judgment on the ground of qualified immunity.

In *Briner II*, Defendants Thomas and the City also moved for summary judgment. Thomas seeks absolute and qualified immunity for her role in bringing

---

[2] The Sixth Circuit also directed the Court to apply *Houston v. Hill*, 482 U.S. 451, 461 (1987), to Plaintiffs' First Amendment claims. None of the parties have raised *Houston* in this most recent round of dispositive motions, as it does not directly relate to the issue of qualified immunity. The Court will, however, entertain any motions *in lmine* on this subject prior to trial.

criminal charges against Melanie Briner. She and the City also seek dismissal of the claims on the merits.

**Standard of Review**

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. […]

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. […] The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a

4

genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**Analysis**

A.        **Motion of Officer Hill and Dallas Strickler for Summary Judgment**

In early 2004, Plaintiffs, Melanie and Thomas Briner, purchased a local towing business known as F&W Towing. (*Briner I*, Doc. No. 42, Am. Compl. at ¶ 10.) Later in the same year (2004), Plaintiffs agreed to trade two of their tow trucks to an employee, Larry Paone, in exchange for a 1993 GMC pickup truck. (*Id*. at ¶ 17.) On December 1, 2004, the parties exchanged their respective vehicles. While Plaintiffs took possession of the pickup truck on that date, it is undisputed that Paone failed to provide the title to the vehicle, claiming that he could not locate it. (*Id*.)

Plaintiffs discharged Larry on December 12, 2004, after allegedly discovering that he was using a company truck, along with other company assets, for personal use. (*Id*. at ¶ 18.) He returned to F&W on December 16, 2004 to discuss his termination. He was unable to convince Plaintiffs to reconsider his termination. Before he left, however, Plaintiffs reminded Larry that he needed to supply them with the title to the pickup truck. According to Plaintiffs, Larry returned on December 30, 2004, and delivered the title to Melanie Briner,[3] which Melanie Briner had notarized. (*Id*. at ¶ 20.)

On January 25, 2005, Larry Paone's father, Dave Paone, contacted Chief McClaran and advised him that he was going to the Briners home to recover the pickup

---

[3] Larry claimed that he had not gone to F&W Towing on this date, insisting that he was with his father, Dave Paone. The Briners eventually prevailed in a conversion action they brought against Larry regarding the pickup truck. At the trial of this state court matter, Larry testified that could not recall where he was on that date. *Briner,* 2010 U.S. App. LEXIS 6271, at *4.

truck.[4] Chief McClaran assured Dave that the police would not interfere in what he viewed as a civil matter. Chief McClaran then informed the dispatcher that if a call came in from the Briners, it was to be treated as a legal repossession of a truck. When the Briners realized that the pickup truck was missing from their property, they contacted the OPD and were advised by the dispatcher that "Chief McClaran said the truck was not stolen because it is back in the hands of its rightful owner." (Am. Compl. at ¶ 26; McClaran Dep. at 40, 45, 51-52.)

Dissatisfied with this explanation, Plaintiffs returned to the Ontario Police Department, this time to file a report of theft of the pickup truck, and to present a copy of the title which had allegedly been signed by Larry Paone. Plaintiffs spoke with Officer Hill, who took the Briners' statements and opened the investigation. Officer Hill escorted the Briners to the interview room, where he, unbeknownst to Plaintiffs, videotaped the interviews. Officer Hill made the decision to record these interviews, based, in part, on his belief that the Briners' prior complaint about the OPD's handling of a separate matter involving another employee was a "false or unfair complaint."[5]

---

[4] In a sworn affidavit, Dave Paone later explained that he took the truck because he felt that Plaintiffs were taking advantage of his son. He also claimed that Plaintiffs had failed to fix a problem with one of the tow trucks they gave to Larry. Dave insisted that he took the truck "in order to make things right." *Briner, supra*, at *5 (quoting D. Paone Stm.)).

[5] Also in late 2004, F&W Towing was burglarized, and approximately $2,000 dollars was taken from the premises. (Am. Compl. at ¶ 13.) When the Briners reported the theft to the OPD, they shared with OPD officers their belief that a recently terminated employee, Billy Hamm, had perpetrated the crime. (*Id.*) The theft was briefly investigated by Detective Snavely, who ceased all activity on the case after interviewing Hamm and his wife. Tom and Melanie Briner eventually complained to Chief McClaran that the OPD did not give the theft the attention it deserved. (*Id.* at ¶¶ 14-15.) They also complained that an OPD officer had accompanied Hamm to F&W Towing to assist Hamm in collecting his last paycheck, believing this to be an improper use of police personnel. Chief McClaran explained that Hamm was accompanied by a police officer as part of a "civil standby," whereby the presence of a uniformed officer is used to diffuse a potentially volatile situation. (McClaran Dep. at 229.)

Officer Hill noticed discrepancies in the title produced by Melanie Briner. Specifically, Hill observed that the price of the vehicle and its odometer reading had been left blank on the title, notwithstanding the fact that the certificate indicated that all blank spaces must be filled. (Doc. No. 147, Ex. 1, Affidavit of Thomas Hill at ¶ 6.) He also noticed that the number "2" in the notarization date had been changed to the number "3," and this was notwithstanding the fact that the certificate indicated that erasers or alterations would void any assignment. (*Id.* at ¶¶ 6-7; Doc. No. 147-1, Title.)

Hill decided to investigate further. He spoke with Larry and Dave Paone, who each informed Hill that the pickup truck had been "repossessed." (Hill Dep. at 28-29.) In response to this inquiry, Dave Paone came to the police station and provided a duplicate title that Larry had obtained after representing to the licensing bureau that the title had been lost or stolen. (Hill Dep. at 35.) Officer Hill then permitted Larry and Dave Paone to take witness statement forms home to fill out at their leisure. It is undisputed that Officer Hill verified the completed forms as though they then had been prepared in his presence.[6] *Briner*, 2010 U.S. App. LEXIS 6271, at *7.

Officer Hill also followed up with the Briners. He asked them to come to the police station to answer additional questions. This time, he informed the Briners that he would be videotaping the interviews. He repeatedly asked Melanie Briner if anyone had seen Larry sign the title in her office, and asked her if she made any alterations to the title. Ultimately, she indicated that she was unaware of anyone who might have seen

---

[6] As the Sixth Circuit found, Officer Hill later admitted, under oath, to falsifying these verifications. *Briner, supra*, at 7.

8

Larry signing the title, and further stated that she had not altered the title.[7] (M. Briner Dep. at 30.) Hill urged the Briners to obtain statements from any employees who may have witnessed Larry's signing of the title. In response to this request, Melanie Briner produced the statement of F&W Towing employee, Debra Hissong. In her statement, Hissong indicated that she had seen Larry on December 30, 2004 in the F&W office signing over title to the pickup truck. (Doc. No. 63, at 30-40; Doc. No. 75-1 at ¶ 11, Hissong I Stm.)

Detective Snavely picked up the investigation from Officer Hill. (Hill Dep. at 27.) Snavely took the title to the Richmond County Clerk's Office, where three employees allegedly informed the detective that the omissions and alterations would have voided the title. *Briner, supra*, at *9. No further action was taken by the OPD, however, until after the Briners had lodged additional complaints with the City's Mayor, Chief McClaran, and other City officials over the lack of attention devoted to the investigations into thefts at F&W Towing.

At the direction of either Chief McClaran or Detective Snavely, Officer Hill questioned employee Debra Hissong at the police station. *Briner, supra*, at *10. After Hissong insisted that she had witnessed the signing of the title, Officer Hill permitted Hissong to review the tape from the Briner's interviews wherein Melanie Briner indicated that she did not believe that anyone had witnessed the signing in her office. The Sixth Circuit found that Officer Hill, Chief McClaran, and possibly other

---

[7] While the certificate had clearly been altered, Melanie Briner testified that she answered Officer Hill's question truthfully because she believed that he was asking her if she had changed the title since discovering that the truck was missing. (M. Briner Dep. at 29-30.) The alteration had allegedly taken place shortly after notarization.

officers, threatened Hissong with the felony of filing a false statement if she did not revise her statement. *Briner, supra*, at *11. She ultimately admitted that portions of the statement, which had been typed by Melanie Briner, were false, and recanted the portion of the statement that provided that she had witnessed the signing. *Id.* (Doc. No. 75-1 at ¶ 14, Hissong II Stm.)

On two separate occasions, Chief McClaran contacted the Richland County Prosecutor's Office regarding the filing of felony charges against Melanie Briner. In response to the second inquiry, Chief Criminal Assistant Prosecuting Attorney, Brent Robinson, reiterated in a letter, dated August 18, 2005, his initial determination that he did not believe that the evidence against Melanie Briner would support the filing of felony charges. (Doc. No. 147-2, Letter.) He also offered, however, his belief that Ms. Briner had committed some misdemeanor offenses, and recommended that Chief McClaran speak with the City's Law Director. (*Id.*)

Chief McClaran contacted Law Director Rebecca Thomas in August 2005 to discuss misdemeanor charges against Melanie Briner.[8] Thomas "reviewed the investigative materials prepared by the Ontario Police Department," along with the August 18th letter from Assistant Prosecuting Attorney Robinson. (Doc. No. 147, Ex. 2, Affidavit of Rebecca Thomas at ¶¶ 6-7.)

During this time, the Briners continued to complain about the OPD, and circulated a petition for the creation of a police review board to scrutinize the activity of the OPD. In late August 2005, days after it was announced that the petition had gathered

---

[8] As discussed *infra*, there is a factual dispute as to whether Chief McClaran had previously contacted Thomas in March or April 2005 to discuss possible charges.

enough signatures to secure a place on the November ballot, Thomas approved the filing of misdemeanor charges against Melanie Briner: tampering with records, falsification, and complicity to commit falsification. (Thomas Aff. at ¶¶ 5-6.) The case was assigned by Thomas to one of her assistant prosecutors, Ryan Hoovler. (*Briner II*, Doc. No. 17, Ex. 3, Affidavit of Ryan Hoovler at ¶ 3.)

Hoovler ultimately determined that it was appropriate to dismiss the charges of falsification and tampering with records, after he received a letter from the Clerk of Courts indicating that the Auto Title Office had erroneously informed the OPD that it would have been the normal practice to question notary information on titles. (Hoovler Aff. at ¶¶ 6-7, Attachment.) Hoovler proceeded to trial on the remaining charge of complicity to falsify. At the conclusion of the trial, the Mansfield Municipal Court granted Melanie Briner's motion to dismiss on the ground that the complaint was defective. (Hoovler Aff. at ¶ 8.)

### 1.    *Plaintiffs' Motion to Strike*

Before the Court can reach the merits of the summary judgment motion of Hill and Strickler, it must address a procedural matter. Plaintiffs seek to strike the present dispositive motion on the ground that the Sixth Circuit had determined that there are questions of fact as to whether there was probable cause to support the filing of charges against Melaine Briner, and that this determination forecloses consideration of qualified immunity. *See Briner, supra*, at *34-*35. In support of their position, Plaintiffs observe that the present motion is virtually identical to Defendants' previously filed summary judgment motion. Defendants oppose the motion to strike, complaining that it is nothing more than a supplement to Plaintiffs' brief in opposition to qualified immunity, and

11

should be viewed as an impermissible attempt to circumvent the page limitations for response briefs.

While the question of whether there exists probable cause to bring charges is often (as it is in this case) closely related to the question of whether qualified immunity may lie for the same activity, the two inquires are not identical. *See Mesa v. Prejean*, 543 F.3d 264, 271 (5th Cir. 2008) ("If there is no probable cause to arrest, the question of whether qualified immunity nonetheless applies is a separate legal and factual issue. […T]he analysis of fact that might not support probable cause needs to be distinguished from the analysis of whether a reasonable officer would have known that he was violating a clearly established law when making an arrest.") Even where there are disputed issues of material fact as to whether probable cause exists to file charges, an officer may still be entitled to qualified immunity if he can establish that a reasonable officer could have believed that probable cause existed to arrest. *See, e.g., Adams v. Silva*, 1992 U.S. App. LEXIS 34780, at *5 (6th Cir. Dec. 22, 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."); *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law.") Because the question of qualified immunity was not resolved by the Sixth Circuit, Defendants Hill and Strickler are entitled to raise it at this time.

Plaintiffs also argue, however, that, even if Defendants may pursue qualified immunity on the federal claims, they are not free to seek immunity for the state law claims. The Court disagrees. On summary judgment, Defendants Hill and Strickler

12

raised both qualified immunity on the § 1983 claims and immunity under Ohio Rev. Code § 2744 for the state law claims. (*Briner I*, Doc. No. 75 at 18-20.) Because the Court dismissed all of the claims on the merits, it did not reach the issue of federal or state immunity. When the Sixth Circuit's decision resurrected certain claims, it then became appropriate on remand for this Court to address the previously unresolved issue of federal immunity.[9] The same logic holds true for state statutory immunity. The Court will, therefore, permit Defendants Hill and Strickler to re-assert statutory immunity under § 2744.

Finally, Plaintiffs complain that Defendants Hill and Strickler should be precluded from re-litigating other issues and claims that were resolved by the Sixth Circuit. They also insist that Defendants should not be permitted to raise the "intra-corporate conspiracy doctrine" because it "is a different topic from the defense of qualified immunity." (Mot. at 14.) The Court would agree with Plaintiffs as to the former, and disagree as to the later. In its March 26, 2010 decision, the Sixth Circuit specifically granted Defendants Hill and Strickler leave to raise the applicability of the intra-corporate conspiracy doctrine. *Briner, supra*, at *41. It did not, however, afford Defendants Hill and Strickler leave to revisit issues that were previously resolved by this Court and the Sixth Circuit, and the Court sees no reason to do so either.

In sum, Defendants Hill and Strickler may raise federal and state immunity, and they may also test Plaintiffs' conspiracy claims against the intra-corporate conspiracy doctrine. They may not, however, raise arguments previously addressed, or

_____

[9] The Sixth Circuit recognized the logic of this approach when it specifically extended Defendants Hill and Strickler leave to raise qualified immunity on remand. *See Briner, supra*, at *42, n.26.

re-litigate issues that have been resolved by this Court and the Sixth Circuit. Plaintiffs'
motion to strike (Doc. No. 153) is, therefore, **GRANTED** in part and **DENIED** in part.

>    2.    *Qualified Immunity for Officer Hill*

Qualified immunity shields from liability government officials performing
discretionary functions when their conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would have known. *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982). Stated differently, a "defendant enjoys qualified
immunity on summary judgment unless the facts alleged and the evidence produced,
when viewed in the light most favorable to the plaintiff, would permit a reasonable juror
to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly
established."[10] *Morrison v. Bd of Trs*., 583 F.3d 394, 400 (6th Cir. 2009) (citing *Jones v.
City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)).

The Sixth Circuit has typically followed the two-step sequential inquiry
set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). Under *Katz*, the court first asks
whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts
alleged show the officer's conduct violated a constitutional right." *Id*. at 201. If the
answer to this initial inquiry is "no," "there is no necessity for further inquiries
concerning qualified immunity." *Id*. If, however, a violation could be made out, the
"next, sequential step is to ask whether the right was clearly established. This inquiry []

---

[10] The Sixth Circuit sometimes includes a third inquiry that considers "whether the plaintiff has alleged
sufficient facts, and supported the allegations by sufficient evidence, to indicate what the official allegedly
did was objectively unreasonable in light of the clearly established rights." *Curry v. Hensiner*, 513 F.3d
570, 576 (6th Cir. 2008) (internal citation omitted). "The third inquiry impacts the analysis when *despite*
the violation of a clearly established constitutional right, the official's conduct was objectively reasonable,
and so should still enjoy qualified immunity." *Id.* (emphasis in original).

must be taken in light of the specific context of the case, not as a broad general proposition [.]" *Id.*

In *Pearson v. Callahan*, 129 S. Ct. 808 (2009), the Supreme Court recently abandoned the sequential approach announced in *Katz*, in favor of an analysis that allows the district court to approach the issue of qualified immunity from whatever perspective is most appropriate for the exigencies of the particular case. While the two-prong *Katz* analysis is still appropriate, courts may now address the prongs in whatever order best suits their needs. *Id.* at 818. Thus, the court is free "to consider those questions in whatever order is appropriate in light of the issues before us[,]" *Moldowan v. City of Warren*, 570 F.3d 698, 720 (6th Cir. 2009), "such that we need not decide whether a constitutional violation has occurred if we find that the officer's actions were nevertheless reasonable." *Jefferson v. Lewis*, 594 F.3d 454, 460 (6th Cir. 2010).

*Probable Cause*

The Court begins with an analysis of the availability of qualified immunity for Officer Hill for the portion of the First Amendment retaliation claim relating to the filing of criminal charges against Melanie Briner, and the federal malicious prosecution claim. Officer Hill insists that there was probable cause to support the charges, noting that he relied, in part, on the advice of the prosecutor. Plaintiffs raise the law-of-the-case doctrine, and remind the Court that the Sixth Circuit has already found that there are

genuine issues of material fact with respect to the existence of probable cause.[11] Officer Hill rejects the law-of-the-case doctrine, noting that substantial new evidence, relating to the role of two prosecuting attorneys in the bringing of charges, warrants a fresh look at the issue. *See Wysong v. City of Health*, 260 Fed. App'x 848, 852 (6th Cir. 2008) (explaining that the law-of-the-case doctrine does not apply in "exceptional circumstances," such as where "substantially new evidence has been introduced") (internal citation omitted). Even if the Court considers the "substantially new evidence" relating to the involvement of the county prosecutor and the City's law director in the charging process, however, it would not change the reality that factual disputes preclude summary judgment on the issue of probable cause.

Hill, again, relies on the fact that Melanie Briner presented an altered title that purported to transfer ownership of the pickup truck. According to Officer Hill, this evidence, alone, was sufficient to support a "tampering with records" charge under Ohio Rev. Code § 2913.42(A). Further, the fact that she denied altering the document, when there were obvious signs of altercation, supported the proof necessary to support a "falsification charge under § 2921.13." He also notes that Richland County Chief Criminal Assistant Prosecuting Attorney Brent Robinson found the evidence sufficient to

---

[11] Plaintiffs also argue that the Court should not resolve the question of immunity on motions, but should, instead, reserve this issue for trial. Such an approach would be contrary to Sixth Circuit precedent that encourages district courts to resolve issues of qualified immunity "as early in the litigation as possible." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Pearson*, 129 S. Ct. at 815) (explaining that early resolution is preferred because "qualified immunity, which if it applies is a defense not just against liability, but against suit itself"). *See Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987); *Yates v. City of Cleveland*, 941 F.2d 444, 449 (6th Cir. 1991).

support possible misdemeanor charges against Melanie Briner. (Robinson Aug. 18, 2005 letter.)

Most significant to his analysis, perhaps, is the fact that the City's Law Director, Rebecca Thomas, made the ultimate decision to pursue criminal charges against Melanie Briner. The record reflects that Thomas determined that there existed probable cause after speaking with Chief McClaran and after she reviewed the investigative materials prepared by the OPD. (Thomas Aff. at ¶ 6.)

It is true that "a police officer cannot be liable for Fourth Amendment malicious prosecution when he did not make the decision to bring charges, as long as the information he submitted to the prosecutor is truthful." *Kinkus v. Village of Yorkville*, 289 Fed. App'x 86, 91 (6th Cir. 2008). *See Wysong v. City of Heath*, 2010 U.S. App. LEXIS 9815, at *12 (6th Cir. 2010); *Donovan v. Briggs*, 250 F. Supp. 2d 242, 258 (W.D. Mich. 2003) ("As a practical matter, police officer must be able to rely on the advice of prosecutors. The judicial system depends upon this reliance.") (internal citation omitted.) Hill claims that because he "submitted truthful information to Ontario Law Director Thomas," the independence of Thomas's decision insulates him from liability. (Mot. at 12.)

The independent judgment of a prosecutor "is called into question, however, when the plaintiff provides evidence that the prosecutor was purposely supplied with false or misleading information on which to make his determination of probable cause." *Peterson v. Cazemier*, 164 F. Supp. 2d 1217, 1223 (D. Org. 2001). *See Brothers v. County of Summit*, 2007 U.S. Dist. LEXIS 38468, at *43-*44 (N.D. Ohio May 25, 2007) (citing *Jones v. Chicago*, 856 F.2d 985, 993-94 (7th Cir. 1998)). *See, e.g.,*

17

*Mozzochi v. Borden*, 959 F.2d 1174, 1179 (2nd Cir. 1992); *Strutz v. Hall*, 308 F. Supp. 2d 767 (E.D. Mich. 2004). Here there is a question of fact as to whether Officer Hill provided Thomas with an honest and complete account of the evidence. While Melanie Briner provided two additional sworn statements from F&W Towing employees, which contained statements that corroborated the statements provided by Melanie Briner and Debra Hissong, no one from the OPD ever investigated these statements. *Briner, supra*, at *34. In light of the fact that the prosecutor did not have these statements, nor the benefit of the police's investigation into the veracity of these statements, there is a question of fact as to whether Hill presented Thomas with a full and complete picture of the available evidence.[12] Consequently, this "new" evidence does nothing to resolve the questions of fact that preclude summary judgment on the issue of probable cause. *See, e.g., Adams v. Metiva*, 31 F.3d 375, 388-89 (6th Cir. 1994) (On a malicious prosecution claim, a genuine issue of material fact precluding summary judgment existed as to whether the officer "made a full and fair disclosure of material facts in his incident report.")

---

[12]Also, as previously noted, Officer Hill admitted to permitting the Paones to prepare their witness statements at their leisure, and in the privacy of their own home. He then verified the statements as if they had been prepared in his presence. *Briner, supra*, at *7 This procedure was in stark contrast to the attention and supervision Hill exercised in extracting the statements of the Briners, and calls into question the veracity and the independence of the Paoenes' statements, and lends further support for a finding by a reasonable juror that Officer Hill did not provide Thomas with a complete and accurate picture of the evidence against Melanie Briner.

*Qualified Immunity*

Notwithstanding the existence of genuine issues of material fact as to the existence of probable cause, Officer Hill is still "entitled qualified immunity unless a reasonable officer would know that his conduct violated a clearly established federal right." *Crocket v. Cumberland College*, 316 F.3d 571, 583 (6th Cir. 2003). *See Adams v. Silva*, 1992 U.S. App. LEXIS 34780, at *5 (6th Cir. 1992) ("Although there may be disputed issues of material fact as to whether probable cause existed for [plaintiff's] arrest, the district court could not deny the defendants qualified immunity merely on this basis.") It is well settled that an arrest without probable cause violates the Fourth Amendment. *Donovan v. Thames*, 105 F.3d 291, 297-98 (6th Cir. 1997). Thus, the question becomes whether a reasonable officer in Officer Hill's position would believe that the charges of falsification, tampering with records, and complicity to commit falsification were pursued in violation of Melanie Briner's constitutional rights. To answer this question, the Court must look at the information "possessed [by Hill] at the time […]." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008). *See Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007).

According to Hill, the investigation by the OPD revealed that Melanie Briner had presented an altered document to the OPD. This, Hill suggests, was sufficient to support a finding that Melanie Briner had tampered with records, in violation of Ohio Rev. Code § 2913.42(A). The investigation further revealed that Melanie Briner had insisted that the title had not been altered, even though it was clear that some alteration had taken place. This, Hill suggests, was sufficient to establish that Melanie Briner had engaged in "falsification," in violation of Ohio Rev. Code § 2921.13(A).

19

At the time Thomas was reviewing the materials gathered by the OPD, however, Officer Hill was aware, or should have been aware, that there were two corroborating statements that had not been pursued or otherwise investigated by the OPD. Officer Hill also knew that Larry Paone had sworn that he was not at F&W Towing on December 30, 2004, the date in which he allegedly assigned title to Melanie Briner, and had, on the same date, sought a new title, claiming that the original title was lost or stolen. As the Sixth Circuit found, this action calls into question the veracity of Larry Paone's statement[13] and the strength of the case against Melanie Briner. *Briner, supra*, at *34. Finally, Officer Hill was aware that Debra Hissong did not recant her story, which supported Melanie Briner's position as to the ownership of the pickup truck, until after he and Chief McClaran (and possibly other officers) exerted "extreme pressure" by threatening the filing of criminal charges against her. *Id.* Aware of all of these facts, there is a genuine issue of material fact as to whether a reasonable officer would have believed that the filing of criminal charges against Melanie Briner violated her constitutional rights. Ultimately, a jury must decide the factual disputes that will dictate whether Officer Hill is entitled to qualified immunity.

---

[13] As previously noted, the fact that Officer Hill knew that Larry Paone's statement was prepared at home, and that the verification was false, also calls into question the veracity of the statement.

3.        *Qualified Immunity for Dallas Strickler*

Dallas Strickler is the Zoning Inspector for the City of Ontario, Ohio, and has held that position since 2000. (*Briner I*, Doc. No. 147-4, Aff. of Dallas Strickler at ¶ 2.) It is undisputed that, in October 2005, Strickler contacted Tom Briner, and advised him that a portable sign located on the premises of F&W Towing, that contained personal and derogatory comments about Chief McClaran, violated Ontario Zoning Ordinances. (Strickler Aff. at ¶ 5.) When Tom Briner failed to remove the sign, Strickler sent Mr. Briner a letter advising him that the sign violated local zoning ordinances, and that, if the sign was not removed, Strickler would refer the matter to the Ontario Law Department. (*Id.* at ¶ 7; Doc. No. 14704, Letter.) There is no evidence in the record to suggest that the Briners ever removed the sign, or that any further action was taken against the Briners with respect to the sign. (Strickler Aff. at ¶ 12.)

In their Amended Complaint, Plaintiffs allege that the efforts of Strickler and other defendants to interfere with the posting of this portable sign violated their rights under the First Amendment and the Equal Protection Clause. (Am. Compl. at ¶¶ 72-73.) In his motion, Strickler maintains that, because he applied the regulations relating to portable signs equally to Plaintiffs and other citizens, the equal protection claim must fail. (Strickler Aff. at ¶ 11.) This is not a qualified immunity argument. Strickler neither argues that the constitutional rights in question were not clearly established at the time Strickler sought to limit the message, nor that a reasonable official in his position would not have known that his actions violated Melanie Briner's constitutional rights. This argument on the merits is not appropriate at this time, as this Court and the Sixth Circuit have already ruled on the viability of the claim, itself. Of course, if the Court were to

consider the argument on the merits, it would have found (as the Sixth Circuit has previously determined) that there is a question of fact as to whether the zoning ordinances had been selectively enforced against Plaintiffs in violation of their rights to equal protection of law. *Briner*, *supra,* at \*39.

While Strickler offers no argument on the issue of qualified immunity, he does draw the Court's attention the Sixth Circuit's recent decision in *Hussein v. City of Perrysburg*, 2010 U.S. App. LEXIS 17364 (6th Cir. Aug. 20, 2010). There, residents attempted to lay a temporary asphalt driveway to their new home. The city inspector arrived at the worksite and threatened litigation against the subcontractor that was installing the asphalt if the work continued. The residents brought a civil rights action against the zoning inspector claiming due process violations. In ruling that the zoning inspector and his immediate supervisor were entitled to qualified immunity, the court held:

> [S]tate officials are permitted under the Constitution to inform citizens of the officials' view that they are violating state or local law. State officials are also permitted to threaten litigation or prosecution if citizens do not agree to conform their actions to state or local law. […]

*Hussein*, 2010 U.S. App. LEXIS 17364, at \*7.

Like the official in *Hussein*, Strickler did nothing more than inform Tom Briner, first in a telephone conversation and later in writing, of his view that the sign on the Briner's property violated local zoning ordinances, and advise them that if they failed to remove the signs, they "shall be subject to the enforcement remedies and penalties set forth in Chapter 1159 […]." (Doc. No. 147-4, Strickler Aff., June 13, 2006 Letter.) When the Briners failed to remove the signs, Strickler referred the matter to Thomas's office,

and no further action was taken against the Briners. Under these circumstances, the Court finds that a reasonable official in Strickler's position would not have believed that his actions would have violated Plaintiffs' constitutional rights. Stricker is, therefore, entitled to qualified immunity on Plaintiffs' equal protection claim.[14]

### 4. Liability for Hill on Plaintiffs' State Law Claims

Because the Court previously dismissed the state law claims for reasons other than on the merits, and, following remand, these claims were reinstated, the Court will address Officer Hill's arguments relating to the merits of these claims. With respect to the state law claim of malicious prosecution, Officer Hill argues that the "evidence establishes that there was a reasonable ground of suspicion supported by facts and circumstances reasonably known at the time, that Melanie Briner was guilty of the offenses charged." (Mot. at 15.) He also argues that he is entitled to rely on the advice of the prosecutor that probable cause existed to support the charges.

"The elements of the tort of malicious criminal prosecution are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Trussel v. Gen. Motors Corp*., 53 Ohio St. 3d 142, 146 (1990), overruled, in part, on other grounds, *Robb v. Chagrin Lagoons Yacht Club*, 75 Ohio St. 3d 264, 269 (1996)).  As discussed above, there remains

---

[14] The parties disagree as to whether the First Amendment retaliation claim is still viable as against Strickler. (*See* Doc. No. 143-1, Pending Claims Chart.) The same reasons for granting Strickler qualified immunity on the equal protection claim would also apply to the retaliation claim.

a question of fact as to whether there was probable cause to support the filing of misdemeanor charges. Moreover, as also previously noted, the manner in which Officer Hill conducted the investigation creates a genuine issue of material fact as to whether the charges were pursued by Officer Hill with malice. *See, e.g., Burr v. Burns,* 439 F. Supp. 2d 779, 793 (S.D. Ohio 2006) (Questions of fact as to whether arresting officer acted in a malicious manner precluded summary judgment.) As such, summary judgment in favor of Hill on this claim would be inappropriate.

An action for invasion of privacy is (1) the unwarranted appropriation or exploitation of one's personality, (2) the publicizing of one's private affairs with which the public has no legitimate concern, or (3) the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. *Housh v. Peth*, 165 Ohio St. 35, syllabus at ¶ 2. (1956). Officer Hill argues that he "did not exploit Plaintiffs' personality, did not publicize Plaintiffs' private affairs, and did not intrude into Plaintiffs' private activities." (Mot. at 17.)

During the first summary judgment stage, Plaintiffs explained that their invasion of privacy claim was a "false light" claim, insisting that Defendants had "held them up to the public with false representations." Specifically, Plaintiffs highlighted the fact that Chief McClaran had appeared on a radio station in November 2005 and accused Plaintiffs of pursuing the police review board because of the charges filed against Melanie Briner. (*Briner I*, Doc. No. 109 at 1-2, Ex. 1, Affidavit of Melanie Briner at ¶ 1.) At that time, and during this most recent round of dispositive motions, Plaintiffs failed to point to any part of the record that would support a finding that Officer Hill held

24

Plaintiffs in a "false light." Officer Hill is, therefore, entitled to summary judgment on this claim.

To establish a claim for tortuous interference with contract under Ohio law, a plaintiff must prove: (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 176 (1999). Similarly, an action for intentional interference with business relationships "occurs 'when a person, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into or continue a business relationship with another, or perform a contract with another.'" *Chuparkoff v. Farmers Ins. of Columbus, Inc.*, 2006 Ohio App. LEXIS 3198, at ¶ 36 (Ohio Ct. App. 9th Dist. June 28, 2006) (quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14 (1995)). Officer Hill argues that Plaintiffs have failed to present competent evidence that he intentionally procured the breach of any contract involving Plaintiffs, or caused a third party not to enter into or continue a business relationship with Plaintiffs. (Mot. at 17.)

Again, in the first round of briefing, Plaintiffs pointed only to Chief McClaran's role in removing F&W Towing from the City's tow list, and McClaran's alleged efforts to have F&W Towing removed from other governmental towing lists. (*Briner I,* Doc. No. 109 at 2-3.) Missing from their analysis is any evidence that would support a finding that Officer Hill was, in any way, involved with these activities. In the absence of any evidence that Officer Hill interfered with a contract to which the Briners

25

were parties, or with a business relationship involving the Briners, summary dismissal of these claims as against Officer Hill is appropriate.

     5.     *Statutory Immunity for Hill under Ohio Rev. Code § 2744*

Officer Hill also argues that he is immune from Plaintiffs' state law tort claims. He appears to seek both statutory and common law immunity. However, "[t]he effect of R.C. 2744.03, with the exception of the common-law immunity preserved by R.C. 2744.03(A)(7), is to abrogate all other immunity provided under common law." *Singer v. Fairborn*, 73 Ohio App. 3d 809, 822 (Ohio Ct. App. 2nd Dist. 1991). The Court, therefore, turns to Ohio statutory law.

Ohio Rev. Code § 2744.03 provides immunity from tort actions for employees of political subdivisions acting in a governmental or propriety function, and lays out specific exceptions. *Chester v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). Specifically, immunity is not available to an employee who has acted "outside the scope of the employee's employment," acted "with malicious purpose, in bad faith, or in a wonton or reckless manner," or unless "liability is expressly imposed upon the employee by a section of the Revised Code." Ohio Rev. Code § 2744.03(A)(6)(a)-(c). All of the acts that form the basis for Plaintiffs' state law actions against Officer Hill were performed in connection with a "governmental function."[15]

Ohio courts have previously construed the terms found in § 2744.03(a)(6) as follows:

---

[15] Under Ohio Rev. Code § 2744.01(C), "government functions" include the operation of law enforcement personnel. § 2744.01(C)(2)(a).

'Malice' is the willful and intentional design to do injury or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified. […] 'Bad faith' involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another. […] 'Wanton misconduct' is the failure to exercise any care whatsoever. […M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor. Such perversity must be under such conditions that the actor must be conscious that his conduct will, in all likelihood, result in an injury.

*Thorton v. Summit Cty. Children Servs. Bd.*, 2007 Ohio App. LEXIS 4190, at ¶ 11 (Ohio Ct. App. 9th Dist. Sept. 12, 2007) (internal citations omitted). The Ohio Supreme Court has indicated that "showing recklessness is subject to a high standard" where a plaintiff is attempting to abolish employee immunity under Ohio Rev. Code § 2744.03(A)(6). *Rankin v. Cuyahoga Cty. Dept. of Children and Family Servs.*, 118 Ohio St. 3d 392, 398 (2008).

   As discussed in detail above, there remain questions of fact as to whether a reasonable officer would have believed that the filing of charges against Melanie Briner violated clearly established law, and whether Officer Hill presented the prosecutor with a full and fair account of the relevant evidence. *See Barrett v. Wallace*, 107 F. Supp. 2d 949, 956 (S.D. Ohio 2000) (citing Ohio Rev. Code § 2744.03(A)(6)(a)(c)) ("Ohio  law provides a law enforcement official with immunity from any liability when there is no valid claim under § 1983. [...] However, […] qualified immunity does not shield a police officer from liability if a reasonable and competent law enforcement officer would have known that his actions violated clearly established law.")) In addition, previously identified questions of fact surrounding the manner in which Officer Hill conducted the

27

investigation raise the specter of bad faith or recklessness. All of these disputed facts raise genuine issues that must be resolved at trial.[16]

      6.      *Applicability of the Intracorporate Conspiracy Doctrine*

In the Sixth Circuit's March 26, 2010 decision, the court granted Defendants leave on remand to address the question of whether the intracorporate conspiracy doctrine applied to Plaintiffs' conspiracy claims. *Briner, supra*, at 41. Now, Defendant Hill argues that Plaintiffs' federal and state conspiracy claims must fail because any alleged conspiracy was pursued by members of the same governmental entity.

---

[16] Officer Hill also insists that he is entitled to absolute immunity under state law for his presentation of materials to the prosecutor for review. Ohio Rev. Code § 2744.03(A)(7) "preserves common law immunity for a 'political subdivision, and an employee who is a county prosecuting attorney, city director of law, village solicitor, or similar chief legal officer of a political subdivision, an assistant to such person, or a judgment of a court of th[e] state is entitled to any defense or immunity available at common law or established by the Revised Code.'" *Friga v. City of East Cleveland*, 2007 Ohio App. LEXIS 1564, at ¶ 11 (Ohio Ct. App. 8th Dist. Apr. 12, 2007) (quoting Ohio Rev. Code § 2744.03(A)(7)). At common law, prosecuting attorneys and law directors enjoyed absolute immunity when initiating a prosecution and presenting the state's case. *See Willitzer v. McCloud,* 6 Ohio St. 3d 447, 449 (1983). Such complete immunity was not traditionally available for a police officer for his involvement in the charge initiation process. *See Malley v. Briggs*, 475 U.S. 335, 342 (1986) (police officer not entitled to absolute immunity for conduct involved in applying for warrant); *Caudill v. Owen*, 2005 U.S. Dist. LEXIS 44401, at *23 (S.D. Ohio Oct. 17, 2005) (police officers' acts as complaining witness only received qualified immunity); *see also Burns v. Reed*, 500 U.S. 478, 486-87 (1991) ("The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.") Police officers, therefore, only enjoy qualified immunity for their actions as employees of a political subdivision. *See* Ohio Rev. Code § 2744(A)(6). *Compare Alioto v. Shively*, 835 F.2d 1173, 1174 (6th Cir. 1987) (law enforcement officials were entitled to absolute immunity for testimony given in judicial proceedings). The authority cited by Plaintiffs, none of which involved police officers, does not compel a contrary conclusion.

*Federal Conspiracy Claim Under § 1983*

It is well settled that you must have two or more persons or entitles to have a conspiracy. *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991). For this reason, the Sixth Circuit "has adopted the general rule in civil conspiracy actions [brought under 42 U.S.C. § 1985] that a corporation cannot conspire with its own agents or employees." *Id.*

Ohio district courts are split as to whether the intracorporate conspiracy doctrine applies to cases where, like here, conspiracy is raised under 42 U.S.C. § 1983. *Compare Hopkins v. Canton City Bd. of Educ.*, 2010 U.S. Dist. LEXIS 63183, at n.8 (N.D. Ohio June 23, 2010) (intracorporate conspiracy did not apply to conspiracy claims brought under § 1983); *Kinkus v. Village of Yorkville*, 476 F. Supp. 2d 829, 838-41 (S.D. Ohio 2007), rev'd on other grounds, 289 Fed. App'x 86, 89 n. 4 (6th Cir. 2008) (same); *with Adcock v. City of Memphis*, 2007 U.S. Dist. LEXIS 22156, at *4-*5 (W.D. Tenn. Mar. 13, 2007) (intracorporate conspiracy doctrine barred § 1983 conspiracy claim); *Audio Visual Equip. & Supplies, Inc. v. County of Wayne*, 2007 U.S. Dist. LEXIS 86941, at *15 (E.D. Mich. Nov. 27, 2007) (same); *Turner v. Viviano*, 2005 U.S. Dist. LEXIS 35119, at *13 (E.D. Mich. July 15, 2005) (same).

Courts that have rejected the application of the intracorporate conspiracy doctrine for § 1983 conspiracy claims have noted that while § 1985 is in essence a conspiracy statute, § 1983 is not. *See Kinkus*, 476 F. Supp. 2d at 840. Observing that "the heart of the intracorporate conspiracy doctrine is that a corporation cannot conspire with its own agents or employees," these same courts have been reluctant to apply the doctrine to claims that are not also brought against the corporate entity. *Id.* at 841 ("[T]he fact that

29

Plaintiff does not claim that Officer Popp or Chief Anderson conspired with Yorkville to injure him bars the application of the doctrine.")

Here, Plaintiffs have brought their federal conspiracy claim against the City, as well as the individual defendants. This would seem to remove some of the obstacles to applying the doctrine. Nonetheless, the Sixth Circuit has recognized a limited exception to the intracorporate conspiracy doctrine for actions taken outside the scope of employment. This exception "draws 'a distinction between collaborative acts done in pursuit of an employer's business and private acts done by persons who happen to work at the same place.'" *Adcock*, 2007 U.S. Dist. LEXIS 22156, at \*12 (quoting *Johnson v. Hills & Dales General Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994) (conspiracy claim under § 1985(3)). Under this exception, an "intracorporate conspiracy may be established where individual defendants are also named and those defendants act outside the scope of their employment for personal reasons." *Johnson*, 40 F.3d at 840. The plaintiff bears the burden of establishing that the defendants' conduct fell outside the scope of employment. *Id.* at 841.

Defendants act "outside the scope of their employment" when they "pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord*, 411 F. Supp. 2d 153, 165 (N.D.N.Y.), vacated and remanded on other grounds, 249 Fed. App'x 217 (2nd Cir. 2007) (internal citation omitted). *See Johnson*, 40 F.3d at 840 (exception applies where defendants act "for personal reasons"). It could certainly be argued that Defendants Hill and McClaran were merely executing their duties on behalf of the City when they pursued a course of action against Plaintiffs. *See, e.g., Johnson*, 40 F.3d at 841. Record evidence could also support a finding, however, that McClaran took

30

action against the Briners for personal reasons, instead of to merely advance the legitimate business of the City.[17] Moreover, there is evidence that Hill was complicit in McClaran's alleged vendetta. *Briner, supra,* at *41. Because there are questions of fact as to whether the acts were performed within the scope of employment, summary judgment for these individual defendants on the issue of the intracorporate conspiracy doctrine would be inappropriate. *See, e.g., Jones v. City of Youngstown*, 980 F. Supp. 908 (N.D. Ohio 1997) (question of fact as to whether defendant officials improperly used guise of zoning enforcement as cover for illegal drug search precluded finding that officials were acting within the scope of their employment).

### *State Conspiracy Claim*

While the Ohio Supreme Court has yet to address the question of whether the intracorporate conspiracy doctrine applies to state conspiracy claims, the Sixth Circuit has recently applied this doctrine to a state conspiracy claim, noting that it was likely that Ohio's high court would embrace the doctrine. *Bays v. Canty*, 330 Fed. App'x 594 (6th Cir. 2009). Nonetheless, as was the case with the federal claim, questions of fact as to the applicability of the "scope of employment" exception to the doctrine precludes summary judgment in favor of Hill.

---

[17] For example, McClaran's comments of a local radio show, (*Briner I*, Doc. No. 109 at 1-2, Exh. 1, M. Briner Aff. at 1), and  McClaran's comment to Assistant Prosecuting Attorney Robinson that he wished that he had filed felony charges against Melanie Briner, (Robinson Dep. at 8), suggest that McClaran might have been motivated by personal considerations.

B.        **Defendant McClaran's Summary Judgment Motion**

Defendant McClaran also requests summary judgment on the ground of qualified immunity. Specifically, he seeks qualified immunity for his alleged retaliatory actions relating to the failure to investigate the Briners' truck theft and the filing of criminal charges against Melanie Briner. He also asserts immunity for Plaintiffs' federal and state malicious prosecution and civil conspiracy actions.[18]

1.        *Plaintiffs' Motion to Strike*

Once again, before the Court can reach the merits of the summary judgment motion, it must address a motion by Plaintiffs to strike. In their motion, Plaintiffs raise three distinct arguments: first, they argue that McClaran has waived the defense of qualified immunity; second, they note that the Sixth Circuit only afforded Defendants Hill and Strickler leave to raise qualified immunity; and third, they insist that McClaran's motion is not based upon qualified immunity, at all, but is a reiteration of arguments and issues previously resolved by the Sixth Circuit. The Court will address each argument in turn.

According to Plaintiffs, McClaran waived the defense of qualified immunity "long ago." (*Briner I*, Doc. No. 152, Mot. at 1.) They claim that "[t]his is the very first time in the nearly 3½ years since he filed his answer in this case [...]." (*Id.*) This is not true. In his initial summary judgment motion, McClaran raised qualified

---

[18] As discussed above, questions of fact prevent the Court from summarily dismissing the conspiracy claims on the basis of the intracorporate conspiracy doctrine. As such, McClaran's request for summary judgment on these claims is also denied.

immunity as an alternative to his arguments that the claims against him should be dismissed on the merits. (*Briner I*, Doc. No. 55, Mot. at 12-13.) In doing so, he set forth the law applicable to the qualified immunity analysis and then offered argument, applying the facts of the case to support his request. While it was clearly offered as an alternative theory for dismissal, it was presented. The Court simply did not reach the argument because it dismissed the claims on other grounds.

Thus, McClaran is not "in exactly the same posture," as the defendants in the cases relied upon by Plaintiffs. (*See* Mot. at 9.) Defendant McClaran timely raised the defense before the deadline for filing summary judgment, and set it out with sufficient particularity such that it was preserved for further review. *Contrast Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000) (defendant "only cursorily references qualified immunity in his answer to a § 1983 complaint, and thereafter fails to mention, let alone seriously press, his assertion of that affirmative defense […]."); *Yates v. City of Cleveland*, 941 F.2d 444 (6th Cir. 1991) (defendants waited five years to raise qualified immunity, but were still allowed to raise it); *Kennedy v. City of Cleveland*, 797 F.2d 297, 303-04 (6th Cir. 1986) (qualified immunity raised after the deadline for filing dispositive motions was waived).

Moreover, the reasons offered in the case law relied upon by Plaintiffs to support a finding of waiver do not apply. In *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664, 667 (1st Cir. 1996), the First Circuit, noted that "[d]elay generated by claims of qualified immunity may work to the disadvantage of the plaintiff. Witnesses may become unavailable, memories may fade, attorneys fees accumulate, and deserving plaintiffs' recovery is delayed." It was these considerations that caused the court to uphold the

33

district court's finding that defendants had waived the qualified immunity defense. *Id*. at 668. Here, however, the Sixth Circuit has specifically extended other defendants leave to raise qualified immunity. The potential for delay, and the possibility of another interlocutory appeal, already exists. Indeed, it was for this reason that this Court established in its minutes a briefing schedule for *any* dispositive motion on the issue of qualified immunity. (*See Briner I*, April 30, 2010 Minutes (emphasis added)). Thus, Plaintiffs' waiver argument is not well taken. For these same reasons, the Court similarly rejects Plaintiffs' argument that only Hill and Strickler have leave to file. While the Sixth Circuit specifically extended leave to Hill and Strickler, this Court exercises its own discretion to permit McClaran to seek immunity, as well.

As they did with respect to the dispositive motion filed by Hill and Strickler, Plaintiffs also argue that the present dispositive motion is not really a qualified immunity motion, at all, inasmuch as it also raises the intracorporate conspiracy doctrine, advice of counsel, and immunity from the state claims. The Court previously rejected each of these arguments as to the summary judgment motion of Hill and Strickler, and its reasoning is equally applicable to McClaran's motion. As was the case with Defendants Hill and Stricker, however, the Court will not permit McClaran to raise issues that have been resolved by the Sixth Circuit and this Court. Therefore, Plaintiffs' motion to strike is **GRANTED** in part and **DENIED** in part.

2. *Qualified Immunity for McClaran*

Going straight to the inquiry of what a reasonable officer would have believed, McClaran argues that the reasonable officer would have believed that neither suspending the investigation into the alleged theft at F&W Towing, nor filing criminal misdemeanor charges against Melane Briner, would violate any clearly established constitutional rights. In both instances, McClaran relies on the intervening opinion of a prosecutor. With respect to the theft investigation, McClaran relies on the fact that Assistant County Prosecutor Robinson "twice determined that the dispute between Briner and Paone was a civil matter, not a criminal matter, involving the ownership of the truck." (Mot. at 8, citing Robinson Dep. at 10-11.) As for the criminal charges, McClaran relies on the fact that Defendant Thomas, the City's Law Director, made the decision that probable cause existed to prosecute Melanie Briner.

As discussed above, the independent judgment of an intervening prosecutor is called into question when the police officer has provided false or misleading information. *See Peterson*, 164 F. Supp. 2d at 1223; *Brothers*, 2007 U.S. Dist. LEXIS 38468, at *43-*44) (citing *Jones*, 856 F.2d at 993-94); *Strutz*, 308 F. Supp. 2d at 787. There remain genuine issues of material fact as to whether McClaran made a full and fair disclosure to Thomas, such that the Court cannot decide on summary judgment whether a reasonable officer would have relied on the ultimate decision of either prosecutor.

While Hill conducted most of the investigation into possible criminal charges against Melanie Briner, collected the evidence, and ultimately prepared the criminal complaints, it was McClaran who spoke with the City's Law Director about the filing of charges. In her deposition, Thomas admitted that she did not remember whether

35

McClaran shared with her certain key information from the investigation. For example, Thomas admitted that she did not remember being advised by McClaran that Hissong had been threatened with criminal prosecution before she recanted her story. (Thomas Dep. at 77-79.) In light of the fact that Thomas made her determination as to probable cause by reviewing the materials submitted by the OPD (Thomas Aff. at ¶ 6), and there are questions of fact as to whether McClaran (like Hill) made a full and fair disclosure to Thomas, the Court cannot determine on summary judgment that the intervention of the prosecutor absolves McClaran of liability.

McClaran also relies upon the intervening opinion of Chief Criminal Attorney Brent Robinson to justify the failure of the OPD to continue the investigation into the theft of the GMC truck, specifically pointing to a May 13, 2005 letter from Robinson. His reliance on this letter is misplaced for several reasons. First, Robinson did not, in his letter, state that he believed that the theft of the truck was a civil matter, as McClaran suggests. Instead, he stated that he believed that because Melanie Briner's "action of changing the date on the title could reasonably be argues [sic] to be an attempt to enforce the oral contract between the parties […] the issue regarding the changed date on the title is a civil matter between the victim and defendant." (Doc. No. 147-6, May 13, 2005 Robinson Letter.) It is clear from the letter that Robinson did not suggest that the Briner's allegations of theft were baseless or not criminal, only that it did not appear that Melanie Briner had broken the law when she altered the title. (*Id.*)

Second, there is evidence in the record to suggest that McClaran and the OPD abandoned their efforts to investigate the alleged theft of the truck long before Robinson first wrote to McClaran. Specifically, a jury could conclude that Detective

36

Snavely, at the direction of McClaran, had already decided when he took over the investigation in January 2005 that he was not going to investigate the theft of the truck but would instead, focus exclusively on the alleged false statements. *Briner, supra,* at *9. There was also evidence that McClaran had abandoned the theft investigation before Debra Hissong was brought in for questioning on March 10, 2004.[19] *Id.* at 10-11. With these factual disputes surrounding the impact of the Robinson letter, the Court cannot say as a matter of law that McClaran is entitled to qualified immunity on the retaliation claim relating to the theft investigation.[20]

### 3.     *Statutory Immunity for McClaran under Ohio Rev. Code § 2744*

McClaran also seeks immunity for Plaintiff's state law malicious prosecution claim. As previously discussed, the right to such immunity is statutory in nature and flows from Ohio Rev. Code § 2744, which is available to employees who act within the scope of their employee and act without "malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(a)-(b). As was the case with Hill, there are questions of fact as to whether there existed probable cause, an essential element of malicious prosecution. Moreover, there are unresolved factual issues relating to whether a reasonable officer would have relied upon Thomas's assessment as to probable cause, given the fact that McClaran does not appear to have provided a

---

[19] At Melanie Briner's criminal trial, McClaran testified that he was convinced that Melanie Briner had not witnessed Larry Paone sign the title in front of her on December 30, 2004 before he invited Hisson back for questioning. (McClaran Trial Testimony at 201.)

[20] There is also evidence in the record to support a finding that McClaran did not rely upon Robinson's opinion. After receiving the letter, he continued to pursue criminal charges against Melanie Briner for fraud. While he may very well have abandoned the investigation into the theft, he asked Robinson through Detective Snavely to "take another look" at bringing felony fraud charges against Melanie. (*See* August 18, 2005 Robinson letter.) Even after the second letter, Robinson testified that McClaran approached him and expressed the sentiment that "Boy, I really wished you would have charged that as a felony." (Robinson Dep. at 8.)

complete and entirely truthful account of the evidence against Melanie Briner. For these reasons, the Court cannot decide at this stage whether a reasonable officer would have believed that the filing of charges against Melanie Briner did not violate clearly established law. *See Barrett*, 107 F. Supp. at 956. Consequently, and for all of these reasons, Defendant McClaran's summary judgment motion is **DENIED**.

### C. Motion of Thomas and the City for Summary Judgment

In *Briner II*, Thomas and the City move for summary dismissal of the only three claims asserted in the Complaint: namely, malicious prosecution under § 1983, First Amended Retaliation, and loss of consortium. Both Defendants seek summary judgment on the merits of the claims. Thomas also requests absolute and qualified immunity for her actions associated with the bringing of criminal charges against Melanie Briner.

At the outset, it is worth noting that Plaintiffs oppose this final dispositive motion, in part, on the ground that the Sixth Circuit's decision is the law of the case and that its determination that there are questions of fact relating to the existence of probable cause precludes this Court from finding that Thomas had probable cause to order the filing of misdemeanor charges against Melanie Briner. Defendants Thomas and the City insist that the law-of-the-case doctrine only applies to govern the same issues in subsequent stages in the same case. Neither position is entirely accurate.

It is true that "under the law-of-the-case doctrine, findings made at one point in the litigation should continue to govern in subsequent stages of *that* same litigation." *Rouse v. DaimlerChrysler Corp. UAW*, 300 F.3d 711, 715 (6th Cir. 2002) (emphasis added). *See United States v. Mendez*, 498 F.3d 423, 426 (6th Cir. 2007). Nonetheless, the doctrine has been applied to subsequent issues raised in closely related

cases. *See, e.g., Ovida v. Top Ten Jewelery Corp.*, 2005 U.S. Dist. LEXIS 16784 (S.D.N.Y. Aug. 12, 2005) (internal citation omitted) ("[T]he Court will adopt the summary judgment ruling in the [prior] action, which is premised 'on identical allegations to those at issue' in the [present] Action.'") (internal citation omitted); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 401 n.1 (W.D. Pa. 2000) (law-of-the-case doctrine applies to issues previously determined in closely related cases).

There is no doubt that *Briner II* is "closely related" to *Briner I*, with many shared facts and legal issues. Still, the Sixth Circuit's ruling in *Briner I* as to probable cause does not necessarily foreclose consideration of the issue anew in *Briner II*. "Probable cause is defined by asking 'whether at that moment the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Radvansky*, 496 F.3d at 614. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964) (probable cause turns on "whether, at that moment, the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to permit a prudent man in believing that the petitioner had committed or was committing an offense.") A finding that a reasonable officer in the position of Hill or McClaran would have believed that probable cause existed, therefore, does not answer the question as to whether that same reasonable official in Thomas's position, with only the facts known to her at the time, would have found probable cause.

Nonetheless, the Court need not answer the question of whether, from Thomas's perspective, there was probable cause to support the filing of charges against

Melanie Briner because Thomas's actions, even if done without probable cause, are protected by absolute immunity.

        1.     *Absolute Immunity for Thomas for Federal Claims*

        In *Imbler v. Patchman*, 424 U.S. 409, 424-427 (1976), the Supreme Court observed that prosecutors were traditionally immune from suits at common law, and that this common law immunity extends to actions brought under 42 U.S.C. § 1983. This immunity stems from the consideration that if the prosecutor were not immune from suit, "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising his independence of judgment required by his public trust." *Id.* at 422-23.

        This immunity, though absolute, is not without its limitations. Absolute prosecutorial immunity is available only for those activities "intimately associated with the judicial phase of the criminal process." *Id.* at 430. Thus, prosecutors are absolutely immune in § 1983 actions only in "initiating a prosecution and in presenting the State's case." *Id.* at 430. Generally, when they function as an administrator or an investigator, however, absolute immunity does not apply and they are only entitled to qualified immunity. *Buckley v. Fitzimmons*, 509 U.S. 259, 273-74 (1993). The Sixth Circuit has observed, however, that absolute immunity encompasses those "administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution." *Ireland v. Tunis*, 113 F.3d 1435 (6th Cir. 1997). At all times, "the official seeking absolute [prosecutorial] immunity bears the burden of showing that such

immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991).

       Plaintiffs challenge Thomas's request for absolute immunity on the ground that her involvement in the filing of criminal charges against Melanie Briner was purely administrative. Plaintiffs rely, in part, on Thomas's deposition testimony wherein she responded in the affirmative to the question "And I presume you did that ('direct the Ontario Police to charge Ms. Briner with the criminal offenses that were filed') within your administrative capacity as the Ontario Law Director, correct?" (Thomas Dep. at 34-35.)

       The Court does not, however, rely on labels suggested by opposing counsel to determine the nature of a prosecutor's actions. Instead, courts employ a "functional approach." *Buckley*, 509 U.S. at 269. *See generally, Michaels v. State of New Jersey*, 50 F. Supp. 2d 353, 359 (D.N.J. 1999) ("Whether an actor enjoys absolute or qualified immunity is based on the function he or she performs, not the title he or she holds.") "The analytical key to prosecutorial immunity […] is advocacy—whether the actions in question are those of an advocate." *Spurlock v. Thompson*, 330 F.3d 791, 798 (6th Cir. 2003). *See Harris*, 513 F.3d at 510. "If the challenged actions of the prosecutor were not performed in his role as advocate, if they do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings, then only qualified immunity applies." *Skinner v. Gorovchin*, 463 F.3d 518, 525 (6th Cir. 2006) (quoting *Buckley*, 509 U.S. at 273). *See Joseph v. Patterson*, 795 F.2d 549, 554 (6th Cir.) ("[T]he critical inquiry is how closely related is the prosecutor's challenged activity to his

41

role as an advocate intimately associated with the judicial phase of the criminal process."), overruled on other grounds, *Kalina v. Fletcher*, 522 U.S. 118 (1997).

Applying the functional approach, there can be no doubt that Thomas's actions were performed in her role as advocate, and fall squarely within the range of protected acts contemplated by the Supreme Court in *Imbler*, *supra.* There is no dispute that, in her capacity as Ontario Prosecuting Attorney, she "reviewed the investigative materials prepared by the Ontario Police Department," and "determined that there was probable cause that Melanie Briner had engaged in conduct constituting tampering with records, falsification, and complicity to commit falsification." (Thomas Aff. at ¶ 6.) Also "[a]s Prosecuting Attorney, [she] directed the Ontario police to file against Melanie Briner misdemeanor charges […]." (*Id.* at ¶ 7.) These actions were "intimately associated with the judicial phase of the criminal process," *Imbler, supra*, inasmuch as they were directly associated with the filing of criminal charges. *See Boone v. Kentucky,* 72 Fed. App'x 306, 307 (6th Cir. 2003) ("The decision on whether or not to prosecute is unquestionably advocacy and is at the heart of the *Imbler* holding."); *Ireland,* 113 F.3d at 1446 (quoting *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992)) ("The decision to initiate a prosecution is at the core of a prosecutor's judicial role.") *See, e.g., Manetta v. Macomb County Enforcement Team,* 141 F.3d 270, 274 (6th Cir. 1998) (quoting *Ireland*, 113 F.3d at 1446 (Absolute immunity "extends to '[a] prosecutor's decision to file a criminal complaint and seek an arrest warrant and the presentation of these materials to a judicial officer.")

Thomas did not, as Plaintiffs suggest, provide the OPD with legal advice. Nor did she participate in the investigative stage of the action against Melanie Briner, or

direct the OPD to take any action in connection with their investigation. *Contrast Prince v. Hicks,* 198 F.3d 607, 613 (6th Cir. 1999) (No absolute immunity for prosecutor who allegedly "undertook to perform an investigation […]."); *Joseph,* 795 F.2d at 555 (absolute immunity was not available for prosecutor who allegedly interrogated a witness while she was in police custody and coerced her into making false statements which supported a later criminal complaint against the plaintiffs of a civil rights action). After the OPD's investigation was complete, McClaran asked Thomas to make a decision as to misdemeanor charges. Thomas then evaluated the evidence presented to her by the OPD, made a determination as to probable cause, and instructed the OPD to file the charges. Such action is clearly contemplated within the term "advocacy." *See Ireland*, 113 F.3d at 1445 ("Investigative acts undertaken in direct preparation of judicial proceedings, including the professional evaluation of evidence, warrant absolute immunity […].")

Try as they might, Plaintiffs cannot force *Briner II* into the mold of the Sixth Circuit's decision in *Harris*, which appears to be the impetis of the filing of *Briner II*. (*See Briner II*, Doc. No. 1, Compl. at ¶ 1.) There, the prosecutor, after discovering that a suspect had confessed to the murder, and after going to the police station to view the videotape of the interrogation, directed the police to arrest the suspect. *Harris*, 513 F.3d at 508. The court determined that absolute immunity was not available for the prosecutor, noting that she went "beyond merely advising the police; she *instructed* them to arrest Harris, without soliciting any officer's opinion." *Id*. at 510 (emphasis in original.)

In withholding absolute immunity, the court relied on the Supreme Court's decision in *Burns*, wherein the high court denied absolute immunity to a prosecutor who instructed police officers, during their investigation, to use hypnosis on a suspect. The

court found that "advising the police in the investigative stage of a criminal case is [not] so 'intimately associated with the judicial phase of the criminal process' that it qualifies for absolute immunity." *Burns*, 500 U.S. at 493 (quoting *Imbler*, 424 U.S. at 430).

In contrast to *Harris*, Thomas did not insert herself into the OPD's investigation, and, in contrast to *Burns*, she did not play a role in or provide advice to the police officers during the investigation. Instead, after the investigation was complete, she evaluated the evidence and initiated the criminal process by directing Hill to file criminal complaints against Melanie Briner.

Plaintiffs also maintain, without authority, that Thomas's actions were merely administrative because she ultimately delegated to a subordinate the duties of prosecuting the case. They also make much of the fact that it is possible for the police to bring misdemeanor charges without seeking the approval of the Law Director. (McClaran Dep. at 156-57; Thomas Dep. at 47-48.)  Neither argument has merit.

The fact that Thomas delegated trial duties to an assistant does not diminish her prior actions of evaluating the evidence and approving the filing of charges. *See Kulwicki*, 969 F.2d at 1463 ("The decision *to initiate a prosecution* is at the core of a prosecutor's judicial role.") (emphasis added.) Moreover, while it may be possible for the police to file misdemeanor charges without attorney involvement, it is clear that, in this case, Thomas made the decision regarding probable cause, and that she directed the police to file the charges.[21] Indeed, Plaintiffs allege that it was Thomas who instructed the police to file the charges. (*Briner II*, Compl. at ¶ 7, "These charges were filed pursuant to

---

[21] While Thomas testified that she is not usually called upon to make the decision as to filing charges, this was not the only time she was asked to do so. (Thomas Dep. at 47-48.)

the explicit instructions of Defendant, Rebecca Thomas, in her capacity as Law Director and Prosecutor.") It rings hollow for Plaintiffs to argue now that Thomas did not make the decision to charge.

Finally, Plaintiffs posit that Thomas is not entitled to summary judgment on the issue of absolute immunity because Defendants Thomas and McClaran "each tell *widely* different and inconsistent versions" as to how the decision to charge was made. (*Briner II*, Doc. No. 19 at 15 (emphasis added)). Neither Plaintiffs' characterization of the evidence, nor their conclusion as to the availability of summary judgment, is correct. Plaintiffs highlight the fact that McClaran testified that he spoke with Thomas once regarding the filing of charges against Melanie Brier (McClaran Dep. at 123), while Thomas recalled that they spoke on two occasions, once in April 2005 (Thomas Dep. at 13), and a second time in August 2005.[22] (*Id.* at 16.) While a disputed fact exists, it is not material to the issue of absolute immunity. Whether there was one, or there were two, phone conversations is of no consequence, as there is no dispute as to the nature of Thomas's actions. Called upon by the OPD to do so, she evaluated the evidence, found the existence of probable cause, and instructed the OPD to file charges. These activities form the very core of a prosecutor's judicial role, and absolute immunity is available for

---

[22] Thomas testified that the April 2005 phone call was "a general telephone call," while in the second call McClaran "was wanting [Thomas] to look at the case for charges […]." (Thomas Dep. at 13, 16.)

45

such acts.[23] *See Ireland*, 113 F.3d at 1446.

2.     *Absolute Immunity for Thomas for State Claim*

"Section 2744.03(A)(7) preserves the absolute immunity afforded prosecutors at common law." *Ward v. Fink*, 2006 U.S. Dist. LEXIS 15004, at *14 (N.D. Ohio Mar. 31, 2006) (citing *Barstow v. Waller*, 2004 Ohio App. LEXIS 5198, at 17 (Ohio Ct. App. 4th Dist. Oct. 26, 2004)). Like the federal courts, Ohio courts also employ a functional approach "in determining whether the prosecutor's acts are quasi-judicial as opposed to investigative or administrative […]." *Willitzer*, 6 Ohio St. 3d at 449. Ultimately, the same consideration—whether a prosecutor's actions are "intimately associated with the judicial phase of the criminal process"—governs the absolute immunity analysis under Ohio statutory law. *Id*. (citing *Imbler*, 424 U.S. at 430-31). Thus, for the same reasons that support a finding of absolute immunity for the federal claims, Thomas is entitled to absolute immunity for the state claim of loss of consortium.

3.     *Municipal Liability for the City*

Plaintiffs also seek to recover from the City for the claims raised in the Complaint, all of which are tied to Thomas's actions relating to the filing of charges

---

[23] Plaintiffs raise a potential bias or prejudice Thomas may have harbored in light of the fact that she once represented Larry Paone in a domestic relations matter. (Thomas Dep. at 73-74.) However, "a prosecutor's decision to file charges is protected by absolute immunity even if done vindictively, maliciously, or without adequate investigation." *Rhodes v. Smithers*, 939 F. Supp. 1256, 1268 (S.D.W.Va. 1995). *See Grant v. Hollenbach*, 870 F.2d 1135 (6th Cir. 1989) (recognizing that the advocatory decisions of prosecutors are protected by absolute immunity irrespective of bad faith or malice). *See generally, Mireles v. Waco*, 502 U.S. 9, 11 (1991) ("[J]udicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial."); *Beckett v. Ford*, 2010 U.S. App. LEXIS 12957, at *46 (6th Cir. June 24, 2010) (Even if the prosecutor "threatened, coerced, or enticed" a witness into providing false testimony, it was still protected by absolute immunity.)

against Melanie Briner. A governmental entity may not be held liable under 42 U.S.C. § 1983 for an employee's conduct on the basis of *respondeat superior*. *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 690-91 (1978). Rather, a plaintiff must show that the government entity itself is the wrongdoer. *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992). In order to establish governmental liability, a plaintiff must demonstrate that an officially executed policy, or the tolerance of a custom, led to or caused the deprivation of a constitutionally protected right. *Collins*, 503 U.S. at 122. As such, Plaintiffs must demonstrate that: (1) a constitutional violation occurred, and (2) the City is responsible for that violation. *Graham v. County of Wastenaw*, 358 F.3d 377, 382 (6th Cir. 2004). The City shall only be responsible if the policy in question was the "moving force" behind the alleged underlying constitutional violation. *Monell*, at 694; *Doe v. Claiborne County*, 103 F.3d 495, 507-08 (6th Cir. 1996).

The term "policy" generally "implies a course of action consciously chosen from among various alternatives […]." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). A policy reflects "a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). A "custom" for purposes of *Monell* liability must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691. In turn, the concept of "law" includes "deeply embedded traditional ways of carrying out state policy [...]." *Nashville, C. & S. L. Railway v. Browning*, 310 U.S. 362, 369 (1940). In short, a "custom" is a "legal institution that is permanent and established" but not memorialized by written law. *Feliciano v. City of Cleveland*, 988 F.2d 649, 655

47

(6th Cir. 1993).

Thomas represents that, at all times relevant to *Briner II*, "the City of Ontario did not have a policy, practice or custom of filing false criminal charges." (Thomas Aff. at ¶ 10.) Nor have Plaintiffs pointed to a written policy to that effect. In the absence of a written policy, Plaintiffs must produce evidence of a "clear and persistent pattern" of illegal activity that would rise to the level of a policy or custom. *See Doe*, 103 F.3d at 508.

The circumstances surrounding the alleged baseless charging of Melanie Briner, alone, cannot establish an overarching policy condoning such behavior. As the Sixth Circuit observed in *Thomas v. City of Chattanooga*:

> The question here is whether there was some sort of policy, custom, or practice in the Chattanooga Police Department of condoning excessive force, and under *Doe*, such a policy must be shown by a clear and persistent pattern. [internal citation omitted] The danger in appellants' argument is that they are attempting to infer a municipal-wide policy based solely on one instance of potential misconduct. This argument, taken to its logical end, would result in the collapsing of municipal liability standard into a simple *respondeat superior* standard. This path to municipal liability has been forbidden by the Supreme Court.

*Thomas*, 398 F.3d 426, 432-33 (6th Cir. 2005) (citations omitted). The court in *Thomas* concluded that "the plaintiff bears a heavy burden in proving municipal liability, and he cannot rely on a single instance to infer a policy of deliberate indifference." *Id.*

Plaintiffs offer no evidence as to the existence of a practice or custom of filing false charges, but, instead, attack Thomas's affidavit averring the absence of any policy to that effect on the ground, that because Thomas did not personally prosecute misdemeanor charges, she "would not be in a position to have first-hand knowledge of those matters." (*Briner II*, Doc. No. 19 at 18.) As discussed above, however, Thomas's

48

role as Law Director cannot be relegated to that of administrative secretary merely because, after performing her duties as Law Director by finding probable cause and instructing the filing of charges, she assigned the trial work to another attorney.

Plaintiffs argue, however, that the other "fatal weakness" in the City's argument is that their primary theory of municipal liability, is that of the "actions of a policymaker" as set out in *Pembaur*. They insist that Thomas is the "highest ranking policymaking official in her department," and her actions bind the City. (Doc. No. 19 at 18.) However, even where the municipal liability is based upon the acts of a prosecutor, a plaintiff must still establish that the prosecutor's actions were pursuant to an unconstitutional policy or custom.[24] *See Collins v. Deegan,* 49 Fed. App'x 571, 573 (6th Cir. 2002) (Without the allegation of an unconstitutional policy or custom, "any claims against St. Clair County based upon [the prosecutor's] actions were properly dismissed for failure to state a clam upon which relief may be granted."); *Wallace v. County of Calhoun*, 2010 U.S. Dist. LEXIS 36796 (W.D. Mich. Apr. 14, 2010) ("[A]llegations that there were negligent acts by the prosecutor as the policymaker for Calhoun County, without out showing that the acts were the result of a policy or custom, do not support liability under § 1983.") (citing *Molton v. City of Cleveland*, 839 F.2d 240, 246 (6th Cir. 1988)). Plaintiffs having failed to demonstrate a genuine issue of material fact as to municipal liability, the City is entitled to summary judgment.

---

[24] Of course, allegations that Thomas's actions as the highest-ranking official bind the City contradict Plaintiffs' insistence that she would have no personal knowledge as to her employer's policy regarding the filing of criminal charges.

**Conclusion**

For all of the foregoing reasons, in *Briner I*, the summary judgment motion of Defendants Hill and Strickler is **GRANTED** in part and **DENIED** in part. The state claims of invasion of privacy, tortuous interference with contract, and interference with contract are dismissed as to Defendant Hill, only. Defendant Strickler is **GRANTED** qualified immunity for the Equal Protection claim and (to the extent he has not previously been dismissed from) the First Amendment retaliation claim. Defendant McClaran's summary judgment motion is **DENIED** in its entirety. Questions as to the availability of qualified immunity for Defendants Hill and McClaran must be resolved at trial. In *Briner II*, the summary judgment motion of Defendants Thomas and City is **GRANTED**. All claims in *Briner II* are dismissed against the City, and Defendant Thomas is afforded absolute immunity as to all claims.

**IT IS SO ORDERED**.

Dated: October 7, 2010

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

50